IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

CONNIE BENNETT & DONALD BENNETT,

         Plaintiffs,

v.                                        Civil Action No. 2:13-cv-06641

BOSTON SCIENTIFIC CORP.,

         Defendant.

**MEMORANDUM OPINION AND ORDER**
*(Defendant's Motion for Partial Summary Judgment)*

Pending before the court is Defendant Boston Scientific Corp.'s ("BSC") Motion for Partial Summary Judgment on Plaintiff Connie Bennett's Punitive Damages Claim and Memorandum in Support ("Motion") [Docket 61]. As set forth below, BSC's Motion is **DENIED**.

**I.  Background**

This case resides in one of seven MDLs assigned to me by the Judicial Panel on Multidistrict Litigation concerning the use of transvaginal surgical mesh to treat pelvic organ prolapse ("POP") and stress urinary incontinence ("SUI"). In the seven MDLs, there are more than 70,000 cases currently pending, approximately 15,000 of which are in the Boston Scientific Corp. MDL, MDL 2326. In an effort to efficiently and effectively manage this massive MDL, I decided to conduct pretrial discovery and motions practice on an individualized basis so that once a case is trial-ready (that is, after the court has ruled on all *Daubert* motions and summary judgment motions, among other things), it can then be promptly transferred or remanded to the

appropriate district for trial. To this end, I ordered the plaintiffs and defendant to each select 50 cases, which would then become part of a "wave" of cases to be prepared for trial and, if necessary, remanded. (*See* Pretrial Order # 65, *In re Bos. Scientific Corp. Pelvic Repair Sys. Prods. Liab. Litig.*, No. 2:12-md-002326, entered Dec. 19, 2013, *available at* http://www.wvsd.uscourts.gov/MDL/boston/orders.html). This selection process was completed twice, creating two waves of 100 cases, Wave 1 and Wave 2. The Bennetts' case was selected as a Wave 1 case by the plaintiffs.

Plaintiff Connie Bennett was surgically implanted with the Obtryx Transobturator Mid-Urethral Sling System (the "Obtryx") on August 15, 2008. (Short Form Compl. [Docket 1] ¶¶ 8, 10). She received the surgery at a hospital in Weston, West Virginia. (*Id.* ¶ 11). Her implanting surgeon was Dr. Peter Edgerton. (*Id.* ¶ 12). Ms. Bennett claims that as a result of implantation of the Obtryx, she has experienced multiple complications, including "urinary tract infections; urinary problems; bowel problems; bleeding; dyspareunia; emotional distress; extreme pelvic abdominal pain and tenderness; back pain and leg pain." (First Am. Pl. Fact Sheet [Docket 67-10], at 6–7). She brings the following claims against BSC: strict liability for manufacturing defect, failure to warn, and design defect; negligence; breaches of express and implied warranties; fraudulent concealment; and punitive damages. (Short Form Compl. [Docket 1] ¶ 13). Mr. Bennett brings a claim for loss of consortium. (*Id.*). In the instant motion, BSC moves for partial summary judgment on the grounds that the plaintiffs' claim for punitive damages is "without evidentiary or legal support." (Def.'s Mot. for Partial Summ. J. on Pl.'s Punitive Damages Claim & Mem. in Supp. ("Mem. in Supp.") [Docket 61], at 1).

## II. Legal Standards

### A. Partial Summary Judgment

A partial summary judgment "is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case." Fed. R. Civ. P. 56 advisory committee's note. A motion for partial summary judgment is governed by the same standard applied to consideration of a full motion for summary judgment. *See Pettengill v. United States*, 867 F. Supp. 380, 381 (E.D. Va. 1994) (citing *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985)). To obtain summary judgment, the moving party must show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict" in his or her favor. *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or unsupported speculation, without more, are insufficient to

3

preclude the granting of a summary judgment motion. *See Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013); *Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 191 (4th Cir. 1997).

### B. Choice of Law

Under 28 U.S.C. § 1407, this court has authority to rule on pretrial motions in MDL cases such as this. The choice of law for these pretrial motions depends on whether they involve federal or state law. "When analyzing questions of federal law, the transferee court should apply the law of the circuit in which it is located. When considering questions of state law, however, the transferee court must apply the state law that would have applied to the individual cases had they not been transferred for consolidation." *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 97 F.3d 1050, 1055 (8th Cir. 1996) (internal citations omitted). In cases based on diversity jurisdiction, the choice-of-law rules to be used are those of the states where the actions were originally filed. *See In re Air Disaster at Ramstein Air Base, Ger.*, 81 F.3d 570, 576 (5th Cir. 1996) ("Where a transferee court presides over several diversity actions consolidated under the multidistrict rules, the choice of law rules of each jurisdiction in which the transferred actions were originally filed must be applied."); *In re Air Crash Disaster Near Chi., Ill.*, 644 F.2d 594, 610 (7th Cir. 1981); *In re Digitek Prods. Liab. Litig.*, MDL No. 2:08-md-01968, 2010 WL 2102330, at *7 (S.D. W. Va. May 25, 2010).

If a plaintiff files her claim directly into the MDL in the Southern District of West Virginia, however, as the Bennetts did in this case, I consult the choice-of-law rules of the state in which the implantation surgery took place. *See Sanchez v. Bos. Scientific Corp.*, 2:12-cv-05762, 2014 WL 202787, at *4 (S.D. W. Va. Jan. 17, 2014) ("For cases that originate elsewhere and are directly filed into the MDL, I will follow the better-reasoned authority that applies the choice-of-law rules of the originating jurisdiction, which in our case is the state in which the plaintiff was implanted with the product."). Ms. Bennett received her implantation surgery in

West Virginia. (Short Form Compl. [Docket 1] ¶ 11). Thus, the choice-of-law principles of West Virginia guide this court's choice-of-law analysis.

## III. Analysis

The plaintiffs and BSC do not dispute that West Virginia's choice-of-law principles apply here. (*See* Mem. in Supp. [Docket 61], at 9; Pls.' Resp. in Opp'n to Def.'s Mot. for Partial Summ. J. on Pls.' Punitive Damages Claim ("Resp. in Opp'n") [Docket 79], at 9). BSC, however, contends that West Virginia's choice-of-law principles dictate application of Massachusetts substantive law to the plaintiffs' punitive damages claims. (*See* Mem. in Supp. [Docket 61], at 9–13). By contrast, the plaintiffs maintain that West Virginia law controls this issue. (*See* Resp. in Opp'n [Docket 79], at 10–12).

### A. Choice of Law in West Virginia

This situation is very similar, if not nearly identical, to the situation I faced in *Hendricks v. Boston Scientific Corp.*, 51 F. Supp. 3d 638 (S.D. W. Va. 2014). There, I wrote the following:

> I turn first to West Virginia's choice-of-law principles. With respect to causes of action sounding in tort, West Virginia follows the traditional rule that the applicable substantive law is the law of the place of injury. *West Virginia ex rel. Chemtall, Inc. v. Madden*, 607 S.E.2d 772, 779–80 (W. Va. 2004); *McKinney v. Fairchild Intern., Inc.*, 487 S.E.2d 913, 922 (W. Va. 1997) ("Traditionally, West Virginia courts apply the *lex loci delicti* choice-of-law rule; that is, the substantive rights between the parties are determined by the law of the place of injury."); *Paul v. Nat'l Life*, 352 S.E.2d 550, 555, 555 n.13 (W. Va. 1986) (noting that "[*l*]ex *loci delicti* has long been the cornerstone of our conflict of laws doctrine" and collecting cases).
>
> It is true that on a handful of occasions the Supreme Court of Appeals of West Virginia has invoked the most-significant-relationship test in the tort context. *See, e.g.*, *Oakes v. Oxygen Therapy Servs.*, 363 S.E.2d 130, 131 (W. Va. 1987) (noting that the court has used the most-significant-relationship test to resolve "particularly thorny conflicts problems"). However, such circumstances have arisen in "cases involving complex, or unusual, contractual situations and *torts which very existence are dependent upon the brea[d]th and legality of contracts.*" *Ball v. Joy Mfg. Co.*, 755 F. Supp. 1344, 1351 (S.D. W. Va. 1990) (emphasis added) (citing *Lee v. Saliga*, 373 S.E.2d 345, 350–52 (W. Va. 1988); *Oakes*, 363

S.E.2d at 131; *New v. Tac & C Energy, Inc.*, 355 S.E.2d 629 (W. Va. 1987); *General Elec. Co. v. Keyser*, 275 S.E.2d 289 (W. Va. 1981)).

In *Oakes*, for example, the complexity that triggered the most-significant-relationship test arose from "the relationship between the Maryland [employment] *contract* and appellant's *tort* theory." 363 S.E.2d at 132 (emphases added). The *Oakes* court faced a peculiar dilemma. On the one hand, if the court characterized plaintiff's claim purely as one of *contract*, it would likely conclude under West Virginia's conflicts principles that Maryland law applied because Maryland was the place of contracting and the document contained a choice-of-law provision selecting Maryland law. *See id.* ("The plaintiff was employed . . . under an employment contract signed by the parties in Maryland that specified that Maryland law should apply to all matters arising under the contract."). On the other hand, if the court characterized plaintiff's claim as one of *tort*, it might conclude that West Virginia law applied because the plaintiff was physically present in West Virginia when he was discharged, that is, plaintiff felt his injury in West Virginia. *See id.* (noting that the decision to terminate the plaintiff occurred in Maryland "while [plaintiff] was hospitalized in West Virginia"). Rather than rigidly apply traditional contract or *lex loci delicti* choice-of-law principles, the court reasoned that the facts were "sufficiently complex because of the relationship between the Maryland contract and appellant's tort theory that the *Restatement* standards," which include the most-significant-relationship test, "provide useful guidance." *Id.*

Similarly, in *Lee v. Saliga*, the Supreme Court of Appeals noted that "[t]here is in any uninsured motorist case a related tort aspect." 373 S.E.2d 345, 348 (W. Va. 1988). But the court's invocation of the most-significant-relationship test was not explicitly premised on the interplay between the tort and contract issues. Instead, the court reached the narrow conclusion that "where in a suit for the recovery of uninsured motorist insurance benefits an issue arises which involves insurance coverage, that issue is to be resolved under conflict of laws principles applicable to contracts." 373 S.E.2d 345, 349 (W. Va. 1988) (footnote omitted); *id.* at 350 ("Having concluded that the issue presented is one of contract, we turn to a discussion of the appropriate conflicts rule."). In short, it appears that the contractual nature of the claim, rather than a finding of a particularly thorny conflicts problem involving aspects of contract and tort, triggered the most-significant-relationship test. The court announced a narrow rule to address the specific circumstances before it:

> [W]e find that the Restatement standard and its commentary provide useful guidance along with our earlier cases in fashioning the following rule: The provisions of a motor vehicle liability policy will ordinarily be construed according to the laws of the state where the policy was issued and the risk insured was principally located, unless another state has a more significant relationship to the transaction and the parties.

6

> *Id.* at 352–53 (footnote omitted).
>
> Here, the defendant, headquartered in Massachusetts, sells products in many states across the country. The defendant has not contracted with the plaintiffs in the sense an employer contracts with employees or an insurer contracts with motorists. In fact, there are no complex or unusual contractual wrinkles between the defendant and plaintiffs that bear significantly on the underlying product-liability claims regarding pelvic mesh. Rather than implicating aspects of tort *and* contract, these are "clear-cut cases of physical injury," to which "the *lex loci delicti* rule has generally been applied [in West Virginia]." *Oakes*, 363 S.E.2d at 131.
>
> Stated simply, the plaintiffs were implanted with and allegedly injured by the defendant's product in West Virginia. There is no reason to depart from West Virginia's traditional conflicts principles and I **FIND** that West Virginia law applies to plaintiffs' punitive damages claims. *Cf. In re C.R. Bard, Inc.*, MDL No. 2187, 2013 WL 2432871, at *2–3 (S.D. W. Va. June 4, 2013) ("Under Georgia law, the traditional *lex loci delicti* rule generally applies to tort actions. . . . With respect to the Cissons, the surgery to implant Ms. Cisson's [pelvic mesh] product was performed in Georgia and any alleged injuries occurred in Georgia. Accordingly, Georgia law applies to [the punitive damages claim in] the Cisson case."). "Certainly, a West Virginia court has an interest in protecting its citizens from tortious conduct and is not precluded from doing so simply because some of the tortious conduct occurred in another state." *Boyd v. Goffoli*, 608 S.E.2d 169, 179 (W. Va. 2004) (finding constitutional application of West Virginia punitive damages law when "Pennsylvania scheme" harmed West Virginia residents).

*Id.* at 641–42.

After reviewing the parties' briefs, I see no persuasive reason to deviate from my prior holding. Therefore, I **ADOPT** my reasoning in *Hendricks*, and because the alleged injury occurred in West Virginia, where Ms. Bennett was implanted with the allegedly defective device, (*see* Short Form Compl. [Docket 1] ¶¶ 11, 13), I **FIND** that West Virginia's substantive law applies to the plaintiffs' punitive damages claim.

### B. Standard of Proof for Punitive Damages

In West Virginia, the "law has long required more than a showing of simple negligence to recover punitive damages." *Bennett v. 3 C Coal Co.*, 379 S.E.2d 388, 394 (W. Va. 1989). Punitive damages are appropriate against a defendant "[i]n actions of tort, where gross fraud,

7

malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear." Syl. Pt. 11, *Vandevender v. Sheetz, Inc.*, 490 S.E.2d 678, 682 (W. Va. 1997) (quoting Syl. Pt. 4, *Mayer v. Frobe*, 22 S.E. 58, 58 (W. Va. 1895)); *see also* Syl. Pt. 12, *Marsch v. Am. Elec. Power Co.*, 530 S.E.2d 173, 177 (W. Va. 1999) (noting that punitive damages serve as "punishment for [the defendant's] wilfulness, wantonness, malice, or other like aggravation of his wrong to the plaintiff, over and above full compensation for all injuries directly or indirectly resulting from such wrong" (internal quotation marks and citations omitted)).

BSC argues that this court should adopt the standard of clear and convincing evidence to the plaintiffs' claim of punitive damages rather than the standard of a preponderance of the evidence because there is no controlling law on the standard of proof. (Mem. in Supp. [Docket 61], at 14–19). I am not convinced.

In *Coleman v. Sopher*, the Supreme Court of Appeals of West Virginia dealt with the same argument that BSC is raising:

> Sopher urges that, in the context of punitive damages, there must be *clear cut and convincing evidence* to support a jury instruction. In support of this contention, Sopher cites *Michael v. Sabado*, 192 W.Va. 585, 601, 453 S.E.2d 419, 435 (1994). The portion of *Sabado* referred to by Sopher contains the Court's discussion of two cases cited by the appellant in that case. Justice Cleckley observed that "the evidence presented was clear cut. The plaintiffs in these two cases were able to convincingly prove definite misrepresentations by the respective defendants." Justice Cleckley's observations about those two cases are dicta, and do not establish a new standard requiring clear and convincing evidence to support jury instructions on punitive damages.

499 S.E.2d 592, 606 n.21 (W. Va. 1997) (emphasis in original). It is clear from this language that *Coleman* rejected the argument that West Virginia should adopt the standard of clear and convincing evidence to prevail on a claim of punitive damages. Furthermore, in *Goodwin v. Thomas*, the court quoted a jury instruction using the preponderance-of-the-evidence standard for

8

punitive damages. 403 S.E.2d 13, 16 (W. Va. 1991). Although "the appropriateness of this instruction was not at issue," (Mem. in Supp. [Docket 61], at 16), nevertheless, I find it telling that the court did not say anything to suggest that "clear and convincing evidence" should be the standard while discussing the sufficiency of the evidence.

In addition, BSC's argument with respect to *Muzelak v. King Chevrolet, Inc.*, 368 S.E.2d 710 (W. Va. 1988), is unavailing. Although BSC claims that the Supreme Court of Appeals of West Virginia in *Muzelak* did not note with any disapproval a jury instruction using the clear-and-convincing-evidence standard, (Mem. in Supp. [Docket 61], at 16), the claim itself in *Muzelak* required a showing of clear and convincing evidence, *see Muzelak*, 368 S.E.2d at 714 n.7. It would therefore follow that proving a claim for punitive damages would also require clear and convincing evidence.

More recently, Justice Ketchum wrote in a concurring opinion that West Virginia's punitive damages law is a "confusing hodgepodge" and proposed that the court "should, at least, *modify* three elements of our punitive damage law." *Perrine v. E.I. du Pont de Nemours & Co.*, 694 S.E.2d 815, 919 (W. Va. 2010) (Ketchum, J., concurring in part and dissenting in part) (emphasis added); (*see* Mem. in Supp. [Docket 61], at 16). Justice Ketchum's statement that the Supreme Court of Appeals of West Virginia should "modify" the existing punitive damages law to adopt "clear and convincing evidence" as the standard implies that the current standard is otherwise—which is to say "preponderance of the evidence."

Given the great weight of prior West Virginia decisions using the standard of "preponderance of the evidence," and without sure indication from the Supreme Court of

Appeals of West Virginia to the contrary,[1] I **FIND** that the proper standard of proof for punitive damages in West Virginia is proof by a preponderance of the evidence.

### C. Punitive Damages in West Virginia

The plaintiffs assert that BSC engaged in wanton, willful, or reckless conduct with regard to the claims alleged by plaintiffs related to the Obtryx. (*See* Resp. in Opp'n [Docket 79], at 15–17). The question on partial summary judgment, then, is whether the plaintiffs' allegations raise any genuine factual disputes. I recently resolved a similar issue under West Virginia law in favor of the plaintiffs. *See Hendricks v. Bos. Scientific Corp.*, 51 F. Supp. 3d 638 (S.D. W. Va. 2014) (concluding on similar evidence that "there is a genuine dispute of material fact whether BSC's actions with respect to the Obtryx device warrant an award of punitive damages"). My analysis in *Hendricks* similarly applies to the present claims regarding the Obtryx device.

Here, the plaintiffs argue that BSC was aware that the polypropylene used to construct the Obtryx device was not intended to be implanted in the human body. (*See* Resp. in Opp'n [Docket 79], at 16). The plaintiffs point to a material data safety sheet ("MSDS") issued by BSC's supplier of polypropylene that warned BSC not to implant the material in the human body. The Obtryx device is constructed using a polypropylene resin supplied by Chevron Phillips Chemical Company LP. Chevron Phillips authored the MSDS that accompanied the resin. The MSDS included the following warning:

> MEDICAL APPLICATION CAUTION: Do not use this Chevron Phillips Chemical Company LP material in medical applications involving permanent

---

[1] BSC notes one case where a Kanawha County Circuit Court judge "rejected proposed instructions submitted by both parties that identified the standard of proof as a 'preponderance of the evidence.' The circuit court opted for an instruction using the 'clear and convincing' standard, stating, 'I just think that the time has come when [clear and convincing] will be the standard.'" *Accord v. Phillip Morris USA, Inc. (In re Tobacco Litig.)*, No. 13-1204, 2014 WL 5545853, at *5 n.14 (W. Va. Nov. 3, 2014); (*see* Mem. in Supp. [Docket 61], at 16–17). The Supreme Court of Appeals sidestepped the issue, writing, "We can easily dispose of petitioners' third assignment of error without delving into the issue of the proper standard of proof for a punitive damages instruction because any potential error was clearly harmless." *Accord*, 2014 WL 5545853, at *5.

>     implantation in the human body or permanent contact with internal body fluids or tissues.

(MSDS [Docket 79-5], at 1). Despite this warning, BSC used Chevron Phillips polypropylene in its Obtryx devices.

Additionally, the plaintiffs argue that BSC knew it needed to conduct long-term safety studies of the polypropylene material in the Obtryx device. (Resp. in Opp'n [Docket 79], at 16–17). The plaintiffs point to the written agreement between BSC and its polypropylene supplier ("the Agreement"). The Agreement cautioned BSC to make its own determination of the safety and suitability of the polypropylene material in BSC's products. The agreement stated:

>     BOSTON SCIENTIFIC IS ADVISED AND CAUTIONED TO MAKE ITS OWN DETERMINATION AND ASSESSMENT OF THE SAFETY AND SUITABILITY OF THE . . . POLYPROPYLENE PRODUCT FOR USE BY, FOR OR ON BEHALF OF BOSTON SCIENTIFIC. IT IS THE ULTIMATE RESPONSIBILITY OF BOSTON SCIENTIFIC TO ENSURE THAT THE . . . POLYPROPYLENE PRODUCT IS SUITED TO BOSTON SCIENTIFIC'S SPECIFIC APPLICATION.

(Agreement [Docket 79-7], at PageID #8665–66).

Despite the MSDS warning and the admonition from BSC's polypropylene supplier to conduct its own tests, an internal BSC document indicated that BSC sponsored no clinical studies on the Obtryx device. (*See* Obtryx Clinical Risk/Benefit Analysis [Docket 79-1], at PageID #8617).

In light of this evidence, I **FIND** that there is a genuine dispute of material fact whether BSC's actions with respect to the Obtryx device warrant an award of punitive damages. A reasonable jury could find that by ignoring a warning on the MSDS and failing to conduct clinical testing, BSC's actions were wanton, willful, or reckless under West Virginia punitive damages law. *Cf. Davis v. Celotex Corp.*, 420 S.E.2d 557, 561 (W. Va. 1992) ("[W]e conclude that when an asbestos manufacturer has actual or constructive knowledge of the severe health

hazards caused by a product and continues to manufacture and distribute that product, the manufacturer may be found liable for punitive damages to those injured by the product."). Accordingly, BSC's Motion is **DENIED**.

### IV.     Conclusion

For the reasons discussed above, it is **ORDERED** that BSC's Motion [Docket 61] be **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTERED:    April 28, 2015

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE